MARY E. CARMICHAEL, plaintiff in error, *vs.* JEREMIAH WALTERS, defendant in error.

1. A married woman having a separate estate settled upon her, with no clause of restraint against alienation, executes a mortgage upon her separate property, to secure the creditor of her husband, there being no proof of coercion by the husband or fraud or imposition by the creditor : *Held*, that the mortgage is good and binds the separate estate of the wife.

In Equity, in Dougherty Superior Court.　Decision by Judge ALLEN, at June Term, 1862.

Mary E. Carmichael, the plaintiff in error, filed her bill, stating that at the time of her marriage with her husband, Gilbert C. Carmichael, she was possessed in her own right of certain negro slaves, nine in number, mentioned in the bill, and that some time after the marriage, her husband, in pursuance of a verbal ante-nuptial contract, conveyed by deed to her, for her sole and separate use, the negroes and their increase. The deed was made on the 4th August, 1845, and recorded a few days after in Macon county, the then residence of her husband, he, at the time the bill was filed, being a resident of Savannah. The negroes, from the time of the execution of the deed, together with their increase, twenty-three in all, worth $15,000 00, have remained her property, and they have been so recognized and treated by her husband, he having managed them as her trustee and agent. These negroes constitute all the property of plaintiff, and are the only means of support for herself and children. Her husband is insolvent and without the means of supporting his family.

The bill further states, that her husband being indebted to Jeremiah Walters, the defendant, in the sum of $8,137 00, gave to Walters, on the 19th January, 1861, his note or draft for said sum, payable at some bank in Savannah, on the 23d March, 1862, and that she was directed by her husband on the same day of the date of the note or draft, to sign a paper which she has since learned was a mortgage on the

negroes to secure the payment of the note or draft, and granting to Walters the right to take possession of the negroes at the maturity of the note, and sell them for its payment.    The instrument was drawn by Walters' direction, her husband consenting thereto.    When the paper was brought to her residence her husband was quite sick in bed, and on going to his room at his request, she found one Joseph Felt, a Justice of the Peace, present with her husband, the latter having the paper in his hands.    A few minutes after she entered the room her husband said, " here, Mary, sign this paper," and she at once complied, her husband also signing. She was wholly ignorant of the contents of the paper, which were not explained to her, nor was it read in her presence. She is unable to give a copy of this instrument, as it is in defendant's possession, and has never been recorded, but prays that a copy be annexed to the answer of defendant.

The bill further alleges, that by the terms of the deed from her husband to herself, the property is not subject to the debts and contracts of her husband, the same being to her sole and separate use, thereby creating a restraint upon the power of alienation of complainant as to the debts of her husband.

The deed is appended as an exhibit to the bill, and the material part is as follows :    Gilbert C. Carmichael conveys to complainant, his wife, " for and in consideration of the natural love and affection he has and bears to her, as well as in consideration of the promises and obligations before marriage, for her sole and separate use," the negroes mentioned in the bill, together with their increase, " all of which belonged to his said wife before marriage.    To have and to hold said property to and for her sole and separate and *undivided* use, benefit and behoof, forever."

Complainant further charges, that Walters is about to foreclose the mortgage for the purpose of levying upon the negroes, or that he will endeavor to take possession of the negroes under the pretended agreement contained in the mortgage, for the purpose of selling them to pay the note of her husband, and thus unlawfully deprive complainant of her property, and herself and children of their support.

The bill states further, that complainant had well hoped that Walters would cease his love of filthy lucre, and not interfere with her rights in the premises, but so it is, he seeks to defraud complainant by pretending that said paper was *bona fide* taken and given.

The bill prays that Walters be enjoined from interfering with the possession of the negroes, or from levying any *fi. fas.* issued from the mortgage upon the negroes.

In accordance with the prayer of the bill an injunction was issued restraining the defendant until the further order of the Court.

The defendant replied to the bill by his answer in the nature of a cross-bill, and alleges that in the spring of 1860, some time before the making and execution of the note and mortgage alluded to in complainant's bill, having full confidence in the business capacity and integrity of Gilbert C. Carmichael, the husband of complainant, then doing business as a commission merchant in the city of Savannah, in partnership with one McDuffie, under the firm of Carmichael & McDuffie, he sent to said Carmichael for sale about one hundred and ninety-six bales of cotton, and which was kept unsold in hope of an advancing market until the last of December, 1860, or the first of January, 1861, at which time, defendant wishing to obtain proceeds from the cotton to meet a debt due by him, he wrote to the firm to sell, as he wanted the money, and that on the 3d January the firm wrote defendant, informing him of an offer made for the cotton, but which had not come up to the price asked by them, and which they hoped yet to get. A short time after the receipt of this letter defendant went to Savannah in order to obtain the money, and was informed by Carmichael that the cotton was sold on the day the letter to defendant was written, and it was agreed that defendant should call the next day, when a settlement should be effected. When defendant went to Carmichael's office, according to this agreement, he was told by Carmichael that the cotton had not all been delivered, and that a settlement could not then be had. Defendant remained in Savannah several days waiting upon Carmichael, who,

from day to day, deferred a settlement with respondent, assigning various excuses for the delay, at one time telling respondent, who had gone to his office, that his clerk had been called unexpectedly, the night before, to Fort Pulaski, and had told him that the key of the safe was left in a certain place, but that the clerk must be mistaken as he could not find it. During this time Carmichael was busy in a pretended search for the key, and not finding it, declared it impossible to make the settlement then as the papers were all locked up in the safe. At another time, he put off defendant by telling him that the wife of his partner was in a dying state and that he could not attend to business.

These repeated delays excited the suspicion of respondent, which were strengthened by conversation with his friends, and fearing that Carmichael had applied the proceeds of the sales to his own use, and being desirous of obtaining as much of them as he could, defendant, without disclosing his suspicions to Carmichael, told him that he wished at that time only about $3,000 to meet his debt, and that if Carmichael would procure him that amount, a check could be sent to defendant for the balance whenever the papers could be obtained. This Carmichael promised to do, and after some delay actually did do. It soon, however, occurred to defendant that this $3,000 might be the proceeds of the sale of seventy-two other bales of cotton, which he had also sent to Carmichael, and he then concluded not to leave for home as he had intended to do, and as he had informed Carmichael he would do. Carmichael having become apprised that defendant had not left, and doubtless surmising the suspicions of defendant, wrote to him, in pencil, "I went to the depot to see you and learned that you had declined going up the road to-day. As I want to see you, and I am crippled, will you please call at my house this evening? I want to see you on business before you leave, without fail."

Defendant, in compliance with this invitation, went to Carmichael's house, and was then, for the first time, informed by him that he had sold the cotton to Caldwell & Company, but that they refused payment, having a claim against

Carmichael for reclamation, but that he could arrange with a friend to get the money that week and would then pay the whole amount to defendant. The fact is, the cotton was not sold to Caldwell & Company but to T. W. Neely & Company, as appears by a copy bill of sales appended to defendant's answer and bill, and defendant is informed by two members of the latter firm,-and so believes, that they paid to Carmichael the amount of said sales, and that no part of it was retained on account of reclamation or any other liability. Moreover the cotton was sold on the 3d November, 1860, and not on the 3d January, 1861, as stated by Carmichael, and part of it had been sold some three or four months when the letter of Carmichael & McDuffie, dated 3d January, 1861, was written.

Carmichael, having failed to procure the money, promised defendant to execute to him a mortgage on some four or five negroes of his own, saying, at the same time, that complainant would execute, with him, a mortgage to defendant on eighteen or twenty negroes, her own property. At a subsequent interview at Carmichael's house, complainant being present, Carmichael repeated this statement, to which complainant assented, and said, " Yes, I will sign anything Mr. Carmichael wishes me to sign." In the first of these two interviews when Carmichael proposed to have the mortgages executed to defendant, it was understood that respondent was to take possession of the negroes, and carry them with him to Dougherty county, the place of his residence, but that in the second, when complainant was present and gave her consent to executing the mortgage nothing was said about defendant's right to carry off the negroes, but defendant denies that complainant did not know that such was the contract, and charges that she did have knowledge of it, and that in a subsequent interview with her, her husband not being present, she begged defendant not to carry off the negroes with him, when defendant replied that possession was half title, and that there could be no settlement unless he was permitted to take them, to which complainant answered, " well, if you will, take

them with you ; take good care of them and treat them well," which defendant promised to do.

Defendant had never told complainant that he intended to carry off the negroes, and as such was the contract, and as Carmichael had told defendant that he had informed his wife of the details of the mortgage and contract, complainant must have learned from him his intention in regard to the negroes. In pursuance of the agreement between defendant and Carmichael, the latter, at his own house, in presence of complainant, gave defendant the names and ages of the negroes, distinguishing which were his own and which the property of complainant, and directed his counsel to draw up the note and mortgage for the amount due by Carmichael & McDuffie on account of the cotton sales, and including the amount of the expenses incurred by defendant while waiting for Carmichael to effect the settlement with him, which Carmichael readily admitted that he ought to pay. While the amount due defendant was being ascertained, Carmichael admitted that the $3,000, which he had paid to defendant were the proceeds of the sale of the seventy-two bales of cotton sent him by defendant as before described, and that they had been sold since defendant's arrival in Savannah. In consequence of this admission, defendant, by the advice of his counsel, refunded the $3,000, and received back his cotton, which was afterwards sold for $3,700 or $3,800.

Defendant left the matter of the execution and recording the mortgage with his attorneys, both of which were properly attended to, and he is at a loss to imagine why complainant could not obtain a copy of the mortgage. Defendant was not present at the execution of the mortgage, and cannot say whether it was read over to complainant or not. Joseph Felt, the Justice of the Peace who witnessed its execution is since dead, and defendant fears that his death was the inducement to complainant to file her bill.

Defendant denies that complainant did not know the contents of the mortgage, and on the contrary charges that she knew all that was contained in it and consented to sign such an one. When complainant expressed her willingness to sign

Carmichael *vs.* Walters.

anything her husband would ask her to sign, she doubtles was perfectly aware of the real condition of affairs, and of her husband's fearful liability, and prompted by her affection as a wife was willing to surrender her entire estate to save him from the consequences of his perfidy.

Defendant repels the insinuation that he was controlled by the love of filthy lucre in securing what had been filched from him by base perfidy, and avers, that if Carmichael had at first told him that he had made use of defendant's money, and had promised to restore it, he would not have thought of a criminal prosecution against Carmichael, but that after the repeated duplicity of Carmichael he had resolved to proceed criminally against him, and was deterred from so doing by the advice of his counsel.

The reason why defendant did not carry off the negroes with him is, that they were subject to a prior mortgage held by Hiram Roberts, who would not permit the negroes to be removed, and it was then agreed that the negroes should be delivered to G. W. Wylie, to be held by him for Roberts and defendant, and defendant left Savannah thinking this would be done.   A short time after, however, he received a letter from Roberts, stating that Carmichael had not delivered the negroes to Wylie.

Defendant further charges, that complainant had, in law, the right to execute the mortgage, and that she did so in good faith with full knowledge of all the facts herein stated, and that she so acted to save her husband from the Penitentiary. It is further charged, that Carmichael is involved in other breaches of trust similar to the case of defendant, and that he is insolvent, and that defendant fears he will remove both complainant and the negroes beyond the limits of the State of Georgia.

The prayer of the cross-bill is, that the defendant's mortgage may be foreclosed, and the negroes mentioned therein be sold and the proceeds applied according to its terms, and that complainant be compelled to give bond with security for the forthcoming of the negroes to answer the judgment upon the mortgage, or in default thereof that the negroes be deliv-

Carmichael *vs.* Walters.

ered to a Receiver to take charge of and hire them out, and to keep them subject to the order of the Court in the premises, and that, in the meantime, the complainant and her agents be enjoined from removing the negroes from without the limits of the State.

This answer and bill was verified on the 9th May, 1861.

The writings referred to in the bill are appended as exhibits, the mortgage being one in the usual form from Carmichael and complainant to defendant and containing an agreement of the mortgagors, that if there should be default in the payment of the note at its maturity, defendant might sell the negroes, according to the act in such cases provided, returning the overplus, if any, to the mortgagees.

There is an entry of service on defendant's answer and cross-bill on complainant, made by the Sheriff of Chatham county with this addition, " I have been unable to find the negroes in her possession, and she denies that they are, and she refuses to deliver the negroes mentioned within, or to give bond as required."

The cross-bill was sanctioned, and Judge Allen, at Chambers, on the 13th May, passed an order requiring complainant to give bond not to remove the negroes as her separate property from the State, and to have them forthcoming to answer the final decree of the Court, and, on failure of such bond being given, the negroes to be delivered to Hiram Roberts, as Receiver, to be managed and kept by him subject to the order of the Court.

At the June term, 1861, of Dougherty Superior Court, the foregoing order was set aside and reversed, on motion of complainant, on the grounds that no bond had been given by respondent, and that the facts stated in his answer cross-bill did not authorize the same, with leave to defendant to give bond and amend his answer.

Defendant in consequence gave the bond, and amended his answer, by charging that complainant had secreted the negroes, and refused to deliver them up, and that he fears the complainant will remove the negroes, if she has not already done so, beyond the limits of the State. That the

Carmichael *vs*. Walters.

Sheriff of Chatham county had made search for them, and could not find them in that county, where they recently were, and that defendant believes they have been carried off to defeat his recovery under his mortgage. The amendment prays an injunction restraining complainant or her agents from carrying the negroes out of the State, and the appointment of a Receiver, under the direction of the Court, so they may be forthcoming to answer the decree upon the mortgage.

The above amendment having been made and bond given, the Chancellor at Chambers passed an order that the injunction prayed for issue, and that complainant should give bond in the sum of ten thousand dollars, to have the negroes forthcoming to answer the decree, and on default thereof, that the Sheriff of Chatham, or any other county where the negroes may be found, shall seize and deliver them to Hiram Roberts, who is appointed Receiver, to take charge of the negroes, to hire them out and to account to the Court for the hire.

At June term, 1862, complainant filed her demurrer, plea and answer to the amended cross-bill of respondent. The grounds of demurrer are: 1. That the relief sought by defendant is not authorized by the statute, but makes of said answer, if the same is a bill at all, an original and not a cross-bill.

2. For the want of proper parties, Hiram Roberts, a prior incumbrancer, and Gilbert C. Carmichael, the trustee of complainant, and a joint mortgagor with her, should have been made parties.

3. Because said cross-bill prays no discovery and no process of subpœna, and there is none, or any process of injunction thereto attached, and which has ever been served on complainant.

4. For want of equity, and because the bond required of complainant by the sanction of, and prayed for in, the bill is onerous and illegal.

5. Because by the admissions of defendant in his answer, the mortgage was obtained by fraud, duress and undue influence, wherefore she prays that the injunction may be dissolved, and the order appointing a Receiver be rescinded.

The plea was to the jurisdiction, Complainant being at the filing of the cross-bill, a resident of Chatham, and now living in Macon county.

Complainant for answer says, that before the mortgage was executed, defendant was informed of her claim to the negroes therein mentioned as hers, and that he might have known fully as to the nature of her claim, as the deed securing them to her was recorded, and the original in her possession, and would have been shown to defendant had he asked for it; and the acceptance by defendant of the mortgage was an acknowledgement of her right to the negroes. Admits she knew that the indebtedness of her husband to defendant was on account of the sale by him of defendant's cotton, but knows not of the devices used to deceive defendant. Admits that after learning her husband's embarrassments, and after defendant had threatened him with a criminal prosecution, and said to her, "that he had Carmichael in his power, and would send him to the penitentiary if she did not sign the mortgage Carmichael had promised she would give him," she consented to sign, saying as alleged, "I will sign anything Mr. Carmichael wishes me to sign." Denies any knowledge of a contract by which defendant was to get possession of the negroes to take them with him, but says she was informed that her husband and trustee had agreed to hire them to defendant at the first interview, and that she was unwilling to assent to this, entered into as it was without her knowledge, and endeavored, when she was informed of it, to induce defendant to abandon it, because he had the reputation of being a hard master. Defendant grew angry at her resistance to this unauthorized contract, and began to threaten her husband with prosecution, and in her fright and alarm, no doubt said, "well, if you will, take them with you, but use them well." Complainant submits that if this was a part of the original contract it should be embodied in the mortgage, and she finds no stipulation in regard to the hire of the negroes to defendant therein contained. It was after a demand made by defendant for the possession of the negroes that she was informed by him that it was part of the agree-

ment between her husband and defendant, that he was to have possession of them. It is true that her husband gave defendant the names of the negroes as charged, but this before she had any information of the agreement as to the possession of the negroes ; knows nothing of the sale of defendant's cotton, by which the $3,000 was paid to him. The mortgage may have been placed on record by defendant's counsel, but she applied through her agent for a copy, and was informed by him that no such record could be found in his office by the Clerk of the Superior Court of Chatham county. Avers that she did not read over the mortgage at the time of its execution, and that she was induced to file her bill by the fraud and imposition used towards her by defendant, and not by the death of the subscribing witness Felt.

Admits her willingness to sign arose from the responsibility incurred by her husband, as told her by defendant, but insists that defendant used the power he induced her to believe he had over her husband to extort her signature. 'Defendant having thus obtained her signature, promised to abandon his threatened prosecution, which promise he subsequently violated to obtain further advantage over complainant and to get possession of her negroes, and she denies that he abandoned the prosecution by the advice of his counsel. Admits that Roberts had a prior incumbrance on the negroes, but knows nothing of any agreement that they should be delivered to Wylie. Knows nothing of, and does not believe, that her husband is involved in any similar difficulties, and admits his insolvency, but denies that defendant was apprehensive that her husband would take her and the negroes out of the State, because he was then confined in the jail of Chatham county for debt, and there remained until February last. Denies secreting the negroes, or causing them to be secreted, nor did she refuse to deliver them up on any proper demand being made for them. If, after their interview, defendant had demanded them, she would not have delivered them, because he had no right to their possession. Denies that she has removed, or contemplates removing them out of the State. A portion of them were in Chatham county and another in

Bibb, when the sheriff made his return. Some were removed because they could be more profitably employed, and would be less liable to escape to or be captured by the public enemies. She has no recollection of ever saying that the negroes were not in her possession.

After argument upon the demurrer it was overruled, and the injunction and order of the Court retained.

The bill of exceptions states that upon the coming in of the answer, complainant moved the Court to dissolve the injunction, and rescind the order for the appointment of a Receiver, which motion the Court refused, and this refusal is assigned as error.

S. P. HALL, VASON & DAVIS, for plaintiff in error.

L. P. D. WARREN, *contra.*

*By the Court.*—LUMPKIN, J., delivering the opinion.

The only question in this record argued before us was this: Is the separate estate of Mrs. Carmichael bound by the mortgage which she executed to Walters in conjunction with her husband? This must be determined by the facts admitted in the pleadings.

It is conceded that Mrs. Carmichael had a separate estate in the negroes mortgaged to Walters. That her husband had been guilty of a breach of trust, which would have subjected him to a criminal prosecution and imprisonment in the penitentiary. That his creditor resolved to enforce the law unless he was indemnified, and that thus circumstanced, the wife, having the absolute power of disposition over her property, with no restraint upon its exercise, mortgaged it to Walters to save her husband from the penalty which he had incurred by his conduct. What, we ask, is there to interfere with this right of alienation? Or to vitiate its exercise. Did Walters misrepresent the case to Mrs. Carmichael? Was there any fraud or imposition practiced upon her? Did he feign a case which had no reality? Was not the husband in his power? And did the wife execute the mortgage to exonerate him,

who will say she was wrong? What better use can a wife make of her property than to relieve her husband—perhaps the father of her children—from disgrace? To attain such an end, well might she say, that she was "willing to sign any instrument which Mr. Carmichael desired her to sign." This is the language of any true-hearted woman. And we know of no principle of law to restrain this natural out-gush of affection. Would it have been justifiable in the mother or sister of Mr. Carmichael thus to have interposed? And is it the less so in the wife?

It has been held to be law ever since the decision of Lord Thurlow, in Hulme vs. Tenant, (1 Brown's Chancery cases, 16,) that if the contract of the married woman, neither referring to her separate estate, nor professing to bind it, but purporting merely to bind herself personally, bound her estate, and not herself. Thus if a married woman executed a bond or signed a promissory note, her execution or signature would be worthless if received as evidence of a mere personal engagement; and the Courts of Equity therefore said, they should be evidence of a contract to bind her separate estate. The case of Hulme and Tenant was this. A married woman, entitled to the rents and profits of real estate for life, joined with her husband in executing a bond. Lord Thurlow held that her separate estate was made liable by the bond. True, Lord Elden frequently expressed his disapprobation of this decision. However, it was followed by Sir William Graves in the case of Heatly vs. Thomas, (15 Vesey, 596.) This was a case of a bond given by the wife as surety, and in Bullpin vs. Clarke, (17 Vesey, 365) this was a case of a promissory note signed by the wife.

The principles upon which the engagement of a married woman, though not referring to her separate estate, are held to bind that estate, may be treated as now clearly settled by the judgment of Lord Brougham in the important cases of Murray vs. Barbe, 3 Mylne and Keen, and Lord Cottingham in Owens vs. Dickinson, Craig and Phillips, 48; and in a more recent decision of Vice Chancellor Wood, in Bolden vs. Nicholson, 3 Jurist, N. S., 884; the Vice Chancellor

thus expresses himself: " Whenever a married woman has property settled to her separate use, and she enters into a contract by which it clearly and manifestly appears that she intends to create a debt as against herself personally—if the expression may be used—it will be assumed that she intended that the money should be paid out of the only property by which she could fulfil the engagement."

If then the mere signing of a note as security for Mr. Carmichael would bind her separate estate, how much more shall the mortgage given by his wife, in his presence, bind her, there being neither proof of any coercion by the husband nor of imposition nor fraud by the creditor.

Let the judgment be affirmed.